UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.:

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY,
and GEICO CASUALTY COMPANY,

       Plaintiffs,

vs.

JOSE ANTONIO MARQUEZ, M.D., EAST
COAST MEDICAL REHAB, INC., JOHANNA A.
FERRER, AMALIA MONTANA, L.M.T., RAY
MEDICAL CENTER, INC., JOSE D. SAA, LUIS
E. GRAU, M.D., MIRTHA FERNANDEZ
FLEITES, L.M.T., and LIUBA ARBOLAEZ,
L.M.T.,

       Defendants.

_____/

**Jury Trial Demanded**

## COMPLAINT

Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), for their Complaint against Defendants, hereby allege as follows:

1.      This action seeks to recover more than $4,600,000.00 that Defendants wrongfully

obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-

fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants

East Coast Medical Rehab, Inc. ("East Coast Medical") and Ray Medical Center, Inc. ("Ray

Medical")(collectively the "Clinic Defendants"), relating to medically unnecessary, illusory,

unlawful, and otherwise non-reimbursable healthcare services, including putative initial

examinations, follow-up examinations, physical therapy services, and range of motion testing (collectively the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims ("Insureds") who were eligible for coverage under GEICO no-fault insurance policies. In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of pending, fraudulent no-fault insurance claims that Defendants have submitted or caused to be submitted through the Clinic Defendants, because of the fraudulent and unlawful activity set forth herein.

2.      Each and every charge submitted through the Clinic Defendants since at least 2014 has been fraudulent and unlawful for the reasons set forth herein. The charts annexed hereto as Exhibits "1" and "2" set forth a large and representative sample of the fraudulent and unlawful claims that have been identified to date that have been submitted to GEICO by mail through East Coast Medical and Ray Medical, respectively. Defendants' interrelated fraudulent schemes began no later than 2014, and have continued uninterrupted since that time.

## THE PARTIES

3.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively, "GEICO") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

4.      The Defendants are as follows:

(i)      Defendant Jose Antonio Marquez, M.D. ("Marquez") resides in and is a citizen of Florida. Marquez was licensed to practice medicine in Florida in 1986. Marquez falsely purported to serve as medical director at East Coast Medical and Ray Medical, and falsely purported to personally perform or directly supervise most of the Fraudulent Services on behalf of each of the Clinic Defendants.

(ii)     Defendant East Coast Medical is a Florida corporation with its principal place of business in Miami, Florida. At all relevant times, East Coast Medical falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Florida Health Care Clinic Act (the "Clinic Act", Fla. Stat. § 400.990 et seq.).  East Coast Medical was incorporated in Florida on or about March 15, 2004, purported to be owned and controlled by Defendant Johanna A. Ferrer ("Ferrer"), falsely purported to have Marquez as its legitimate medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Marquez and Amalia Montana, L.M.T. ("Montana")(Defendants East Coast Medical, Ferrer, Marquez, and Montana collectively are referred to as the "East Coast Medical Defendants").

(iii)    Defendant Ray Medical is a Florida corporation with its principal place of business in Miami, Florida. At all relevant times, Ray Medical falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act. Ray Medical was incorporated in Florida on or about October 21, 2004, purported to be owned and controlled by Defendant Jose D. Saa ("Saa"), falsely purported to have Marquez as its legitimate medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Marquez, Luis Grau, M.D. ("Grau"), Mirtha Fernandez Fleites, L.M.T. ("Fleites"), and Liuba Arbolaez, L.M.T. ("Arbolaez")(Defendants Ray Medical, Saa, Marquez, Grau, Fleites, and Arbolaez collectively are referred to as the "Ray Medical Defendants").

(iv)     All of the natural person Defendants reside in and are citizens of Florida.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

6.      This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

7.      In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

3

8.      Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

## I.      Brief Overview of Pertinent Law Governing No-Fault Insurance Reimbursement

9.      Florida requires automobile insurers to provide PIP insurance benefits ("PIP Benefits") to Insureds when they are injured in a motor vehicle accident. See Florida Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law").

10.      Under the No-Fault Law, a health care services provider that possesses an assignment of PIP Benefits from an Insured and that provides medically necessary health care services to an Insured may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500" form).

11.      In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided, medically necessary, the bill for the service cannot misrepresent the nature, extent, or results of the service that was provided, and the bill for the service cannot misrepresent the identity of the individual who personally performed or supervised the service. Insurers such as GEICO are not required to pay PIP Benefits to anyone who knowingly submits a false or misleading statement relating to a PIP claim or charges.  See Fla. Stat. § 627.736.

12.      In addition, the No-Fault Law prohibits PIP reimbursement for massage or for services provided by massage therapists. See Fla. Stat. § 627.736.

13.      Pursuant to the Clinic Act, clinics operating in Florida without a valid exemption from the licensing requirements must – among other things – appoint a medical director who must

4

"[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful", and take immediate corrective action upon discovery of a fraudulent or unlawful charge. <u>See</u> Fla. Stat. § 400.9935(1).  In addition, a clinic medical director must "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided." <u>See</u> Fla. Stat. § 400.9935(1).

14.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed . . . but that is not so licensed, or that is otherwise operating in violation of this part . . . is an unlawful charge." <u>See</u> Fla. Stat. § 400.9935(3).

**II.     <u>Defendants' Interrelated Fraudulent Schemes</u>**

**A.     The Fraudulent Operation of East Coast Medical and Ray Medical Without Legitimate Medical Directors**

15.     Because East Coast Medical and Ray Medical were subject to the Clinic Act, Ferrer and Saa (collectively the "Clinic Owner Defendants") could not operate East Coast Medical and Ray Medical, respectively, unless licensed physicians were employed as the medical directors at these clinics. However, if the Clinic Owner Defendants retained legitimate physicians to serve as East Coast Medical and Ray Medical's respective medical directors, any such legitimate physicians actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director, which would impede the Defendants' interrelated schemes, as described herein.

16.     Accordingly, Ferrer and Saa each retained Marquez, a licensed physician who was willing – in exchange for compensation – to falsely pose as the legitimate medical director at East Coast Medical and Ray Medical, respectively.

17.     However, Marquez never genuinely served as a medical director for East Coast Medical or Ray Medical. Instead, from the beginning of his association with East Coast Medical and

Ray Medical, he ceded all day-to-day decision-making and oversight regarding healthcare services to the respective Clinic Owner Defendants and their associates.

18.    As set forth herein, in keeping with the fact that Marquez never legitimately served as medical director at East Coast Medical or Ray Medical, Marquez: (i) never ensured that all health care practitioners at East Coast Medical or Ray Medical had active appropriate certification or licensure for the level of care being provided; (ii) never conducted systematic reviews of East Coast Medical or Ray Medical's billings to ensure that the billings were not fraudulent or unlawful; and (iii) never even made any attempt to discover the fraudulent and unlawful charges submitted through East Coast Medical or Ray Medical, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

19.    In further keeping with the fact that Marquez never legitimately served as medical director at either of the Clinic Defendants, Marquez simultaneously: (i) purported to serve as medical director at both clinics; and (ii) purported to personally perform, or at least directly supervise, a massive number of individual health care services for both of the Clinic Defendants, as well as for other clinics in Florida.

20.    It is improbable – to the point of impossibility – that Marquez could have simultaneously personally performed, or even just directly supervised, such a massive number of individual health care services for both of the Clinic Defendants, as well as for other clinics, while also fulfilling his medical director role at either of the Clinic Defendants.

21.    The Clinic Owner Defendants used the facade of Marquez's phony "appointment" as East Coast Medical and Ray Medical's respective "medical directors" to do indirectly what they were forbidden from doing directly – namely, and as set forth more fully herein: (i) to operate health care clinics without legitimate medical directors; (ii) to engage in unlicensed medical

decision-making with respect to the Insureds who sought treatment at East Coast Medical and Ray Medical; (iii) to permit health care services to be provided at East Coast Medical and Ray Medical by individuals who lacked the proper licensure to perform the services; and (iv) to use East Coast Medical and Ray Medical as vehicles to submit a massive amount of fraudulent and unlawful PIP billing to GEICO and other insurers.

22.    Marquez unlawfully permitted the Clinic Owner Defendants to dictate every aspect of the manner in which Insureds would be treated at East Coast Medical and Ray Medical, respectively, and to dictate every aspect of the manner in which health care services at these clinics would be billed to GEICO and other insurers, because he sought to continue profiting from the fraudulent billing submitted through these clinics.

**B.    The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at East Coast Medical and Ray Medical**

23.    Each of the Defendants caused GEICO to be billed for a limited range of Fraudulent Services, namely purported: (i) initial patient examinations; (ii) follow-up patient examinations; and (iii) physical therapy services. In addition, East Coast Medical also caused GEICO to be billed for purported: (i) range of motion testing and (ii) electrodiagnostic testing. As set forth in Exhibits "1" and "2", the purported physical therapy services constituted the vast majority of the Fraudulent Services billed through each of the Clinic Defendants to GEICO.

24.    All of the "physical therapy" services that Defendants purported to provide between at least 2014 and the present were performed – to the extent that they were performed at all – by unsupervised massage therapists including: (i) Defendant Montana at East Coast Medical; and (ii) Defendants Fleites and Arbolaez, in addition to Raphael Senespleda, L.M.T. ("Senespleda"), now deceased, at Ray Medical.

25.     Montana, Fleites, and Arbolaez (collectively the "Massage Therapist Defendants"), along with Senespleda, were only licensed as massage therapists. The Massage Therapist Defendants and Senespleda were never licensed as physical therapists.

26.     The Defendants were well-aware of the fact that health care clinics such as the Clinic Defendants could not legally recover PIP Benefits for "physical therapy" or any other kinds of health care services performed by massage therapists such as the Massage Therapist Defendants and Senespleda. For example, the provisions in the No-Fault Law prohibiting PIP reimbursement for massage or for services provided by massage therapists were widely reported, as was the preceding legal struggle by various massage therapists and massage trade organizations to fight those provisions.

27.     Accordingly, beginning no later than 2014, the Defendants began to falsely represent – in a substantial majority of the bills for "physical therapy" services that they submitted or caused to be submitted through the respective Clinic Defendants to GEICO – that Marquez, a licensed physician, had either personally performed or directly supervised the putative physical therapy services.

28.     In reality, Marquez neither performed nor supervised any of the physical therapy services that were billed to GEICO through East Coast Medical and Ray Medical.

29.     In keeping with the fact that Marquez neither performed nor directly supervised any of the physical therapy services that were billed through the Clinic Defendants to GEICO, Marquez often purported to personally perform or directly supervise more than 20, 30, and even 40 hours of "physical therapy" services for GEICO Insureds on individual dates, often at both of the Clinic Defendants' offices, as well as at several additional clinics/locations, per day.

30.     For example:

(i)     On January 13, 2014, East Coast Medical, Ferrer, and Marquez purported to provide at least 112 individual physical therapy services to at least 14 individual Insureds, and falsely contended in the resulting bills to GEICO that Marquez personally performed, or at least directly supervised, every one of those treatments. What is more, those putative treatments included at least 23.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez also purported to personally perform, or at least directly supervise: (a) one 60-minute new patient examination, two 45-minute new patient examinations, three 40-minute follow-up examinations, one 25-minute follow-up examination, and two 5-minute follow-up examinations that were performed on nine GEICO Insureds at East Coast Medical, Ray Medical, and another clinic called Miami Medical Group, Inc. ("Miami Medical"); and (b) 21 additional physical therapy services purportedly provided to at least three additional GEICO Insureds at Ray Medical and Miami Medical, including at least 3.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 32.5 hours of service that Marquez purported to personally perform, or at least directly supervise, on January 13, 2014.

(ii)    On March 6, 2014, East Coast Medical, Ferrer, and Marquez purported to provide at least 133 individual physical therapy services to at least 16 individual Insureds, and falsely contended in the resulting bills to GEICO that Marquez personally performed, or at least directly supervised, every one of those treatments. What is more, those putative treatments included at least 28.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez also purported to personally perform, or at least directly supervise: (a) one 30-minute new patient examination and one 25-minute follow-up examination that were performed on two GEICO Insureds at East Coast Medical; and (b) five additional physical therapy services purportedly provided to at least one additional GEICO Insured at a clinic called Professional Medical Building Group, Inc. ("Professional Medical"), including at least 0.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 29.5 hours of service that Marquez purported to personally perform, or at least directly supervise, on March 6, 2014.

(iii)   On September 17, 2014, East Coast Medical, Ferrer, and Marquez purported to provide at least 159 individual physical therapy services to at least 21 individual Insureds, and falsely contended in the resulting bills to GEICO that Marquez personally performed, or at least directly supervised, every one of those treatments. What is more, those putative treatments included at least 36.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez also purported to personally perform, or at least directly supervise: (a) one 45-

minute new patient examination, one 25-minute follow-up examination,  one 15-minute follow-up examination, one five-minute follow-up examination, one 60-minute consultation, and one 30-minute consultation that were performed on six GEICO Insureds at East Coast Medical, Ray Medical, and another clinic called Affiliated Healthcare Centers, Inc. ("Affiliated Healthcare"); and (b) 17 additional physical therapy services purportedly provided to at least three additional GEICO Insureds at Ray Medical and Miami Medical, including at least 3.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 43 hours of service that Marquez purported to personally perform, or at least directly supervise, on September 17, 2014.

(iv)     On November 19, 2014, Ray Medical, Saa, and Marquez purported to provide at least 56 individual physical therapy services to at least 8 individual Insureds, at Ray Medical and the home of at least one Insured, and falsely contended in the resulting bills to GEICO that Marquez personally performed, or at least directly supervised, every one of those treatments. What is more, those putative treatments included at least 10.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez also purported to personally perform, or at least directly supervise: (a) one 60-minute new patient examination, one 15-minute follow-up examination, and eight 5-minute follow-up examinations that were performed on 10 GEICO Insureds at Ray Medical, a clinic called Medical Diagnostics Association, Inc. ("Medical Diagnostics"), another clinic called EZ Medical Group ("EZ Medical"), and the home of at least one Insured; and (b) 119 additional physical therapy services purportedly provided to at least 16 additional GEICO Insureds at East Coast Medical and EZ Medical, including at least 25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 37 hours of service that Marquez purported to personally perform, or at least directly supervise, on November 19, 2014.

(v)     On January 28, 2015, East Coast Medical, Ferrer, and Marquez purported to provide at least 117 individual physical therapy services to at least 18 individual Insureds, and falsely contended in the resulting bills to GEICO that Marquez personally performed, or at least directly supervised, every one of those treatments. What is more, those putative treatments included at least 26.00 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez also purported to personally perform, or at least directly supervise: (a) one 25-minute follow-up examination, two 15-minute follow-up evaluations, and five 5-minute follow-up examinations that were performed on eight GEICO Insureds at East Coast Medical, Ray Medical, and EZ Medical; and (b) 68 additional physical therapy services purportedly provided to at least nine additional GEICO Insureds at Ray Medical, Miami Medical, Medical Diagnostics, and EZ Medical, including at least 13 hours of physical therapy services that required direct, one-on-one

patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 40.25 hours of service that Marquez purported to personally perform, or at least directly supervise, on January 28, 2015.

(vi)     On June 1, 2015, East Coast Medical, Ferrer, and Marquez purported to provide at least 120 individual physical therapy services to at least 15 individual Insureds, and falsely contended in the resulting bills to GEICO that Marquez personally performed, or at least directly supervised, every one of those treatments. What is more, those putative treatments included at least 27.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez also purported to personally perform, or at least directly supervise: (a) one 40-minute follow-up examination, two 25-minute follow-up examinations, one 15-minute follow-up examination, and three 5-minute follow-up examinations that were performed on seven GEICO Insureds at East Coast Medical, Ray Medical, and EZ Medical; and (b) 29 additional physical therapy services purportedly provided to at least three additional GEICO Insureds at Ray Medical, Miami Medical, and EZ Medical, including at least 5.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 35 hours of service that Marquez purported to personally perform, or at least directly supervise, on June 1, 2015.

(vii)    On July 27, 2015, Ray Medical, Saa, and Marquez purported to provide at least 31 individual physical therapy services to at least 5 individual Insureds, and falsely contended in the resulting bills to GEICO that Marquez personally performed, or at least directly supervised, every one of those treatments. What is more, those putative treatments included at least 45 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez also purported to personally perform, or at least directly supervise: (a) one 30-minute new patient examination, two 40-minute follow-up examinations, two 15-minute follow-up examinations, and five 5-minute follow-up examinations that were performed on 10 GEICO Insureds at East Coast Medical, Ray Medical, , and Miami Medical; and (b) 92 additional physical therapy services purportedly provided to at least 12 additional GEICO Insureds at East Coast Medical and Miami Medical, including at least 20.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 28 hours of service that Marquez purported to personally perform, or at least directly supervise, on July 27, 2015.

(viii)   On August 24, 2015, East Coast Medical, Ferrer, and Marquez purported to provide at least 93 individual physical therapy services to at least 13 individual Insureds, and falsely contended in the resulting bills to GEICO that Marquez personally performed, or at least directly supervised, every one of those treatments. What is

more, those putative treatments included at least 21.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez <u>also</u> purported to personally perform, or at least directly supervise: (a) one 60-minute new patient examination, one 30-minute new patient examination, three 25-minute follow-up examinations, and five 5-minute follow-up examinations that were performed on 10 GEICO Insureds at East Coast Medical, Ray Medical, Miami Medical, and the home of at least one Insured; and (b) 34 <u>additional</u> physical therapy services purportedly provided to at least five <u>additional</u> GEICO Insureds at Ray Medical, and the home of at least one Insured, including at least 5.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 30.5 hours of service that Marquez purported to personally perform, or at least directly supervise, on August 24, 2015.

(ix)    On May 20, 2016, East Coast Medical, Ferrer, and Marquez purported to provide at least 78 individual physical therapy services to at least 11 individual Insureds, and falsely contended in the resulting bills to GEICO that Marquez personally performed, or at least directly supervised, every one of those treatments. What is more, those putative treatments included at least 17.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez <u>also</u> purported to personally perform, or at least directly supervise: (a) two 5-minute follow-up examinations that were performed on two GEICO Insureds at Ray Medical and the home of at least one message therapist; and (b) 21 <u>additional</u> physical therapy services purportedly provided to at least three <u>additional</u> GEICO Insureds at Ray Medical and another clinic called Advanced Health and Wellness, Inc. ("Advanced Health"), including at least 4 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 21.5 hours of service that Marquez purported to personally perform, or at least directly supervise, on May 20, 2016.

(x)    On August 23, 2016, East Coast Medical, Ferrer, and Marquez purported to provide at least 105 individual physical therapy services to at least 16 individual Insureds, and falsely contended in the resulting bills to GEICO that Marquez personally performed, or at least directly supervised, every one of those treatments. What is more, those putative treatments included at least 22.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez <u>also</u> purported to personally perform, or at least directly supervise: (a) two 30-minute new-patient examinations, one 15-minute follow-up examination, and one 5-minute follow-up examination that were performed on four GEICO Insureds at East Coast Medical, Advanced Health, and the home of at least one Insured; and (b) 14 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at Advanced Health and the home of at least one Insured,

including at least 2.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 26.75 hours of service that Marquez purported to personally perform, or at least directly supervise, on August 23, 2016.

(xi)     On March 16, 2017, East Coast Medical, Ferrer, and Marquez purported to provide at least 76 individual physical therapy services to at least 12 individual Insureds, and falsely contended in the resulting bills to GEICO that Marquez personally performed, or at least directly supervised, every one of those treatments. What is more, those putative treatments included at least 16.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez <u>also</u> purported to personally perform, or at least directly supervise: (a) three 30-minute new patient examinations and six 5-minute follow-up examinations that were performed on nine GEICO Insureds at Ray Medical, Advanced Health, and the homes of at least five Insureds; and (b) 41 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at Ray Medical, Advanced Health, and the homes of at least five Insureds, including at least 6 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 25.25 hours of service that Marquez purported to personally perform, or at least directly supervise, on March 16, 2017.

(xii)    On June 28, 2017, Ray Medical, Saa, and Marquez purported to provide at least 42 individual physical therapy services to at least 6 individual Insureds at Ray Medical and the homes of at least three Insured, and falsely contended in the resulting bills to GEICO that Marquez personally performed, or at least directly supervised, every one of those treatments. What is more, those putative treatments included at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez <u>also</u> purported to personally perform, or at least directly supervise: (a) two 45-minute new patient examinations and six 5-minute follow-up examinations that were performed on seven GEICO Insureds at Ray Medical and the homes of at least four Insureds; and (b) 80 <u>additional</u> physical therapy services purportedly provided to at least 14 <u>additional</u> GEICO Insureds at East Coast Medical, including at least 19.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 28.25 Hours of service that Marquez purported to personally perform, or at least directly supervise, on June 28, 2017.

(xiii)   On October 23, 2017, Ray Medical, Saa, and Marquez purported to provide at least 77 individual physical therapy services to at least 11 individual Insureds at Ray Medical and the homes of at least five Insureds, and falsely contended in the resulting bills to GEICO that Marquez personally performed, or at least directly

supervised, every one of those treatments. What is more, those putative treatments included at least 13 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez <u>also</u> purported to personally perform, or at least directly supervise: (a) one 60-minute new patient examination, one 30-minute new patient examination, two 40-minute follow-up examination, one 15-minute follow-up examination, and twelve 5-minute follow-up examinations that were performed on 17 GEICO Insureds at East Coast Medical, Ray Medical, Miami Medical, and the homes of at least five Insureds; and (b) 57 <u>additional</u> physical therapy services purportedly provided to at least 14 <u>additional</u> GEICO Insureds at East Coast Medical, including at least 14 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 30.0 hours of service that Marquez purported to personally perform, or at least directly supervise, on October 23, 2017.

(xiv)   On October 24, 2018, East Coast Medical, Ferrer, and Marquez purported to provide at least 74 individual physical therapy services to at least 16 individual Insureds, and falsely contended in the resulting bills to GEICO that Marquez personally performed, or at least directly supervised, every one of those treatments. What is more, those putative treatments included at least 18.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez <u>also</u> purported to personally perform, or at least directly supervise: (a) one 40-minute follow-up examination, five 5-minute follow-up examinations, and one 60-minute consultation that were performed on seven GEICO Insureds at East Coast Medical, Ray Medical, Affiliated Health, and the homes of at least three Insureds; and (b) 33 <u>additional</u> physical therapy services purportedly provided to at least five <u>additional</u> GEICO Insureds at Ray Medical and the homes of at least three Insureds, including at least 5.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 26 hours of service that Marquez purported to personally perform, or at least directly supervise, on October 24, 2018.

(xv)   On November 8, 2018, East Coast Medical, Ferrer, and Marquez purported to provide at least 79 individual physical therapy services to at least 15 individual Insureds, and falsely contended in the resulting bills to GEICO that Marquez personally performed, or at least directly supervised, every one of those treatments. What is more, those putative treatments included at least 19 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez <u>also</u> purported to personally perform, or at least directly supervise: (a) one 30-minute new patient examination, four 15-minute follow-up examinations, five 5-minute follow-up examinations, and one 40-minute consultation that were performed on eleven GEICO Insureds at East Coast Medical, Ray Medical,

Affiliated Health, and the homes of at least four Insureds; and (b) 34 <u>additional</u> physical therapy services purportedly provided to at least five <u>additional</u> GEICO Insureds at Ray Medical and the homes of at least four Insureds, including at least 6 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 27.5 hours of service that Marquez purported to personally perform, or at least directly supervise, on November 8, 2018.

(xvi)   On March 7, 2019, East Coast Medical, Ferrer, and Marquez purported to provide at least 85 individual physical therapy services to at least 16 individual Insureds, and falsely contended in the resulting bills to GEICO that Marquez personally performed, or at least directly supervised, every one of those treatments. What is more, those putative treatments included at least 20.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez <u>also</u> purported to personally perform, or at least directly supervise: (a) five 30-minute new patient examinations, two 15-minute follow-up examinations, and seven 5-minute follow-up examinations that were performed on 14 GEICO Insureds at East Coast Medical, Ray Medical, and the homes of at least two Insureds; and (b) 36 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at Ray Medical, Advanced Health, and the homes of at least two Insureds, including at least 6.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 30.5 hours of service that Marquez purported to personally perform, or at least directly supervise, on March 7, 2019.

(xvii)  On August 21, 2019, East Coast Medical, Ferrer, and Marquez purported to provide at least 66 individual physical therapy services to at least 13 individual Insureds, and falsely contended in the resulting bills to GEICO that Marquez personally performed, or at least directly supervised, every one of those treatments. What is more, those putative treatments included at least 15.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez <u>also</u> purported to personally perform, or at least directly supervise: (a) one 15-minute follow-up examination and five 5-minute follow-up examinations that were performed on six GEICO Insureds at East Coast Medical and Ray Medical, and (b) 38 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Ray Medical, including at least 6.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 22.5 hours of service that Marquez purported to personally perform, or at least directly supervise, on August 21, 2019.

(xviii) On August 28, 2019, Ray Medical, Saa, and Marquez purported to provide at least 37 individual physical therapy services to at least 4 individual Insureds, and falsely

contended in the resulting bills to GEICO that Marquez personally performed, or at least directly supervised, every one of those treatments. What is more, those putative treatments included at least 6.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez <u>also</u> purported to personally perform, or at least directly supervise: (a) one 30-minute new patient examination, one 15-minute follow-up examination, and five 5-minute follow-up examinations that were performed on seven GEICO Insureds at East Coast Medical and Ray Medical, and (b) 75 <u>additional</u> physical therapy services purportedly provided to at least 15 <u>additional</u> GEICO Insureds at East Coast Medical, including at least 17 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 24.25 hours of service that Marquez purported to personally perform, or at least directly supervise, on August 28, 2019.

(xix)   On February 5, 2020, Ray Medical, Saa, and Marquez purported to provide at least 52 individual physical therapy services to at least seven individual Insureds at Ray Medical and at the home of at least two Insured, and falsely contended in the resulting bills to GEICO that Marquez personally performed, or at least directly supervised, every one of those treatments. What is more, those putative treatments included at least 9 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez <u>also</u> purported to personally perform, or at least directly supervise: (a) two 30-minute new patient examinations, one 40-minute follow-up examination, three 15-minute follow-up examinations, and six 5-minute follow-up examinations that were performed on eleven GEICO Insureds at East Coast Medical and Ray Medical; and (b) 44 <u>additional</u> physical therapy services purportedly provided to at least 10 <u>additional</u> GEICO Insureds at East Coast Medical, including at least 9.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 21.50 hours of service that Marquez purported to personally perform, or at least directly supervise, on February 5, 2020.

(xx)   On February 10, 2020, East Coast Medical, Ferrer, and Marquez purported to provide at least 71 individual physical therapy services to at least 14 individual Insureds, and falsely contended in the resulting bills to GEICO that Marquez personally performed, or at least directly supervised, every one of those treatments. What is more, those putative treatments included at least 16.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Marquez <u>also</u> purported to personally perform, or at least directly supervise: (a) two 30-minute new patient examinations, one 40-minute follow-up examination, two 15-minute follow-up examinations, and four 5-minute follow-up examinations that were performed on nine GEICO Insureds at East Coast Medical and Ray Medical;

and (b) 27 <u>additional</u> physical therapy services purportedly provided to at least three <u>additional</u> GEICO Insureds at Ray Medical and the home of at least two Insured, including at least 4.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 24 hours of service that Marquez purported to personally perform, or at least directly supervise, on February 10, 2020.

31.     These are only representative examples. It is improbable, to the point of impossibility, that Marquez – who was simultaneously working or purporting to work at various other medical practices and clinics – routinely performed or directly supervised such a massive volume of physical therapy services on individual dates, often at both of the Clinic Defendants, additional clinics, and the Insureds' homes on individual dates.

32.     Upon information and belief, the fraudulent billing for physical therapy services that the Defendants submitted or caused to be submitted through the respective Clinic Defendants to GEICO constituted only a fraction of the <u>total</u> fraudulent billing for physical therapy services that the Defendants submitted through these respective Clinic Defendants to <u>all</u> of the automobile insurers in the Florida automobile insurance market.

33.     It is not credible that the Defendants only submitted fraudulent billing to GEICO, and that the Defendants did not simultaneously bill other automobile insurers.

34.     Thus, upon information and belief, the impossible number of physical therapy services that Marquez purported to directly supervise or perform for GEICO Insureds at East Coast Medical and Ray Medical (among other locations) on individual dates of service constituted only a fraction of the <u>total</u> number of physical therapy services that Marquez purported to directly supervise or perform at these respective Clinic Defendants, including for individuals insured by companies other than GEICO, on those same dates of service.

35.     In keeping with the fact that Marquez never legitimately fulfilled his required duties as "medical director" at East Coast Medical or Ray Medical, each of the claims submitted by Defendants for physical therapy services identified in Exhibits "1" and "2" falsely represented that Marquez had performed or at least directly supervised the underlying physical therapy services, so as to create the false appearance that the services were eligible for PIP reimbursement. In fact, the underlying physical therapy services were not eligible for PIP reimbursement, because they had been performed – to the extent they were performed at all – by massage therapists including: (i) Montana at East Coast Medical and (ii) Fleites, Senespleda, and Arbolaez, at Ray Medical.

36.     In the claims for physical therapy services identified in Exhibits "1" – "2", the Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

    (i)     the putative physical therapy services were performed – to the extent they were performed at all – by massage therapists;

    (ii)    the respective Clinic Defendants could not lawfully recover PIP Benefits for the putative physical therapy services, because they were performed by completely unsupervised massage therapists in contravention of Florida law; and

    (iii)   the Defendants systematically fraudulently misrepresented that the physical therapy services were legitimately performed or supervised by Marquez.

**C.     The Defendants' Fraudulent Treatment and Billing Protocols**

37.     In the claims identified in Exhibits "1" – "2", virtually none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

38.     Even so – and in keeping with the fact that Marquez never legitimately served as medical director at East Coast Medical or Ray Medical – the Defendants purported to subject

virtually every Insured to a medically unnecessary course of "treatment" pursuant to pre-determined, fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

### 1.     The Fraudulent Claims for Initial Examinations

39.     As a first step in their fraudulent treatment and billing protocol, each of the Insureds in the claims identified in Exhibits "1" - "2" purportedly received an initial examination at the respective Clinic Defendants, with Marquez purporting to personally perform or directly supervise a substantial majority of the initial examinations in the claims identified in Exhibit "1" and Marquez and Grau purporting to personally perform or directly supervise a substantial majority of the initial examinations in the claims identified in Exhibit "2".

40.     In the claims identified in Exhibit "1", East Coast Medical, Ferrer, and Marquez submitted bills to GEICO for the purported initial examinations that Marquez purportedly provided at East Coast Medical under CPT codes 99203 and 99204.

41.     Likewise, in the claims identified in Exhibit "2", Ray Medical, Saa, Marquez, and Grau submitted bills to GEICO for the purported initial examinations that Marquez and Grau purportedly provided at Ray Medical under CPT codes 99203 and 99204.

42.     Pursuant to the American Medical Association's CPT Assistant, which governs reimbursement of PIP claims, the use of CPT code 99204 to bill for an initial patient examination represents – among other things – that: (i) the patient presented with problems of moderate to high severity; (ii) the physician who conducted the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family during the examination; (iii) the physician who performed the examination conducted a "comprehensive" physical examination; and (iv) the

physician who performed the examination engaged in "moderate complexity" medical decision-making in connection with the examination.

43.     Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents – among other things – that: (i) the patient presented with problems of moderate severity; (ii) the physician who conducted the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family during the examination; (iii) the physician who performed the examination conducted a "detailed" physical examination; and (iv) the physician who performed the examination engaged in "low complexity" medical decision-making in connection with the examination.

44.     As set forth below, the charges for the initial examinations identified in Exhibits "1" - "2" were fraudulent in that they misrepresented the nature, extent, and results of the purported initial examinations.

**a.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

45.     To the extent that the Insureds in the claims identified in Exhibits "1" and "2" had any presenting problems at all as the result of their typically-minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

46.     For instance, in the vast majority of the claims identified in Exhibits "1" and "2" the Insureds did not seek treatment at any hospital as the result of their accidents. To the limited extent that the Insureds in the claims identified in Exhibits "1" and "2" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and discharged with nothing more serious than a minor soft tissue injury diagnosis.

47.     Furthermore, in the substantial majority of the claims identified in Exhibits "1" and "2", contemporaneous police reports indicated that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the accidents, or injured at all.

48.     Even so, in the claims for initial examinations identified in Exhibits "1" and "2", the respective Clinic Defendants, respective Clinic Owner Defendants, Marquez and Grau billed GEICO for the putative initial examinations using CPT codes 99203 and 99204, and thereby falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity. In fact, the Insureds' problems were low or minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

49.     For example:

(i)     On February 23, 2015, an Insured named LC was involved in an automobile accident. The contemporaneous police report indicated that that the accident was a low-impact collision with no airbag deployment in LC's vehicle and that LC's vehicle was drivable following the accident. In keeping with the fact that LC was not seriously injured in the accident, LC did not visit any hospital emergency room following the accident. To the extent that LC experienced any health problems at all as a result of the accident, they were of minimal or low severity. Even so, following a purported initial examination of LC on March 25, 2015, East Coast Medical, Ferrer, and Marquez billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that LC presented with moderately to highly severe health problems as the result of the accident.

(ii)    On April 4, 2015, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision with no airbag deployment in JR's vehicle and that JR's vehicle was drivable following the accident. In keeping with the fact that JR was not seriously injured in the accident, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JR on June 16, 2015, East Coast Medical, Ferrer, and Marquez billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that JR presented with moderately to highly severe health problems as the result of the accident.

(iii)   On May 5, 2015, an Insured named CH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision

with no airbag deployment in CH's vehicle and that CH's vehicle was drivable following the accident.  The police report further indicated that CH was not injured in the accident. In keeping with the fact that CH was not seriously injured in the accident, CH did not visit any hospital emergency room following the accident. To the extent that CH experienced any health problems as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CH on July 1, 2015, East Coast Medical, Ferrer, and Marquez billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that CH presented with moderately to highly severe health problems as the result of the accident.

(iv)     On May 14, 2015, an Insured named OE was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low impact collision with no airbag deployment in OE's vehicle and that OE's vehicle was drivable following the accident. The police report further indicated that OE was not injured during the accident. In keeping with the fact that OE was not seriously injured in the accident, OE did not visit any hospital emergency room following the accident. To the extent that OE experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of OE on May 21, 2015, East Coast Medical, Ferrer, and Marquez billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that OE presented with moderately severe health problems as the result of the accident.

(v)     On March 5, 2017, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated the accident was a low-impact collision with no airbag deployment in JP's vehicle and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured during the accident. In keeping with the fact that JP was not seriously injured in the accident, JP did not visit any hospital emergency room following the accident. To the extent that JP experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JP on March 23, 2017, East Coast Medical, Ferrer, and Marquez billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that JP presented with moderately severe health problems as the result of the accident.

(vi)     On July 28, 2017, an Insured named GR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision with no airbag deployment in GR's vehicle and that GR's vehicle was drivable following the accident. In keeping with the fact that GR was not seriously injured in the accident, GR did not visit any hospital emergency room following the accident. To the extent that GR experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of GR on July 31, 2017, Ray Medical, Saa, Marquez, and Grau billed GEICO for the initial examination using CPT code 99204, and thereby falsely

represented that GR presented with moderately to highly severe health problems as the result of the accident.

(vii)  On July 28, 2017, an Insured named YR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision with no airbag deployment in YR's vehicle and that YR's vehicle was drivable following the accident. In keeping with the fact that YR was not seriously injured in the accident, YR did not visit any hospital emergency room following the accident. To the extent that YR experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of YR on July 31, 2017, Ray Medical, Saa, Marquez, and Grau billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that YR presented with moderately to highly severe health problems as the result of the accident.

(viii)  On August 24, 2017, an Insured named RF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision with no airbag deployment in RF's vehicle and that RF's vehicle was drivable following the accident. In keeping with the fact that RF was not seriously injured in the accident, RF did not visit any hospital emergency room following the accident. To the extent that RF experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of RF on August 24, 2017, Ray Medical, Saa, and Marquez billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that RF presented with moderately severe health problems as the result of the accident.

(ix)  On July 22, 2019, an Insured named CF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision with no airbag deployment in CF's vehicle and that CF's vehicle was drivable following the accident. In keeping with the fact that CF was not seriously injured in the accident, CF did not visit any hospital emergency room following the accident. To the extent that CF experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CF on July 24, 2019, Ray Medical, Saa, Marquez, and Grau billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that CF presented with moderately severe health problems as the result of the accident.

(x)  On December 27, 2019, an Insured named YA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision with no airbag deployment in YA's vehicle and that YA's vehicle was drivable following the accident. In keeping with the fact that YA was not seriously injured in the accident, YA did not visit any hospital emergency room following the accident. To the extent that YA experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following

a purported initial examination of YA on January 6, 2020, Ray Medical, Saa, Marquez, and Grau billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that YA presented with moderately severe health problems as the result of the accident.

50.     These are only representative examples. In the claims for initial examinations identified in Exhibits "1" and  "2", the respective Clinic Defendants, respective Clinic Owner Defendants, Marquez, and Grau virtually always falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at a higher rate than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.     Misrepresentations Regarding "Detailed" and "Comprehensive" Physical Examinations**

51.     In addition, in the claims for initial examinations identified in Exhibits "1" and "2", when the respective Clinic Defendants, respective Clinic Owner Defendants, Marquez, and Grau billed GEICO for the putative initial examinations using CPT codes 99203 and 99204, they falsely represented that the physician who purported to conduct the examinations – namely Marquez at East Coast Medical and Marquez or Grau at Ray Medical – conducted "detailed" or "comprehensive" physical examinations of the Insureds who purportedly received the examinations.

52.     In fact, with respect to the claims for initial examinations under CPT code 99204 that are identified in Exhibits "1" and "2", neither Marquez, Grau,  nor any other physician or healthcare provider associated with the Clinic Defendants ever conducted a "comprehensive" patient examination because: (i) pursuant to the CPT Assistant, a "comprehensive" physical examination requires – among other things – that the physician performing the examination document a general

examination of multiple patient organ systems or a complete examination of a single patient organ system; but (ii) neither Marquez, Grau, nor any other physician associated with the Clinic Defendants, ever documented a general examination of multiple patient organ systems or a complete examination of a single patient organ system.

53.     In addition, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibits "1" and "2", neither Marquez, Grau, nor any other physician or healthcare provider associated with the Clinic Defendants ever conducted a "detailed" patient examination because: (i) pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician performing the examination document an extended examination of the affected body areas and other symptomatic or related organ systems; but (ii) neither Marquez, Grau, nor any other physician associated with the Clinic Defendants, ever documented an extended examination of the affected body areas and other symptomatic or related organ systems.

54.     For example:

(i)     On March 23, 2015, East Coast Medical, Ferrer, and Marquez billed GEICO under CPT code 99204 for an initial examination that Marquez purported to perform or supervise on an Insured named KS, and thereby represented they had provided a "comprehensive" physical examination to KS. However, Marquez did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ii)    On June 16, 2015, East Coast Medical, Ferrer, and Marquez billed GEICO under CPT code 99204 for an initial examination that Marquez purported to perform or supervise on an Insured named JR, and thereby represented they had provided a "comprehensive" physical examination to JR. However, Marquez did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iii)   On June 18 2015, East Coast Medical, Ferrer, and Marquez billed GEICO under CPT code 99203 for an initial examination that Marquez purported to perform or supervise

on an Insured named KP and thereby represented they had provided a "detailed" physical examination of KP's musculoskeletal systems. However, Marquez did not document such a "detailed" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iv)     On October 14, 2016, Ray Medical, Saa, and Marquez billed GEICO under CPT code 99204 for an initial examination that Marquez purported to perform or supervise on an Insured named DG, and thereby represented they had provided a "comprehensive" physical examination to DG. However, Marquez did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(v)      On May 31, 2017, Ray Medical, Saa, and Marquez billed GEICO under CPT code 99203 for an initial examination that Marquez purported to perform or supervise on an Insured named JR, and thereby represented they had provided a "detailed" physical examination of JR's musculoskeletal systems. However, Marquez did not document such a "detailed" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(vi)     On August 2, 2017, East Coast Medical, Ferrer, and Marquez billed GEICO under CPT code 99203 for an initial examination that Marquez purported to perform or supervise on an Insured named JP, and thereby represented they had provided a "detailed" physical examination of JP's musculoskeletal systems. However, Marquez did not document such a "detailed" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(vii)    On September 20, 2017, Ray Medical, Saa, and Marquez billed GEICO under CPT code 99204 for an initial examination that Marquez purported to perform or supervise on an Insured named MG, and thereby represented they had provided a "comprehensive" physical examination to MG. However, Marquez did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(viii)   On May 14, 2019, Ray Medical, Saa, Marquez, and Grau billed GEICO under CPT code 99203 for an initial examination that Grau purported to perform or supervise on an Insured named TL, and thereby represented they had provided a "detailed" physical examination of TL's musculoskeletal systems. However, Grau did not document such a "detailed" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ix)     On July 2, 2019, East Coast Medical, Ferrer, and Marquez billed GEICO under CPT code 99203 for an initial examination that Marquez purported to perform or supervise on an Insured named BB, and thereby represented they had provided a "detailed" physical examination of BB's musculoskeletal systems. However, Marquez did not

document such a "detailed" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(x)     On November 19, 2018, Ray Medical, Saa, Marquez, and Grau billed GEICO under CPT code 99204 for an initial examination that Grau purported to perform or supervise on an Insured named TA, and thereby represented that they had provided a "comprehensive" physical examination to TA. However, Grau did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

55.     These are only representative examples. In the claims for initial examinations identified in Exhibits "1" and "2", the respective Clinic Defendants, respective Clinic Owner Defendants, Marquez and Grau routinely falsely represented that they provided "comprehensive" or "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT codes 99204 and 99203, because examinations billable under CPT codes 99204 and 99203 are reimbursable at higher rates than examinations that are not "comprehensive" or "detailed".

c.      **Misrepresentations Regarding the Extent of Medical Decision-Making**

56.     Moreover, in the claims for initial examinations identified in Exhibits "1" and "2", when the Clinic Defendants, Clinic Owner Defendants, Marquez and Grau billed GEICO for putative initial examinations using CPT codes 99204 and 99203, they falsely represented that the physician who purported to conduct the examinations – namely Marquez at East Coast Medical and Marquez or Grau at Ray Medical – engaged in some legitimate, moderate complexity or low complexity medical decision-making in connection with the examinations.

57.     In actuality, the purported initial examinations did not involve any legitimate medical decision-making at all.

58.     For instance, in the claims for initial examinations identified in Exhibits "1" and "2": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful

amount of medical records, diagnostic tests, or other information; (ii) there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all; and (iii) Marquez and Grau did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations, and instead – at the direction of the respective Clinic Defendants and respective Clinic Owner Defendants – falsely diagnosed virtually every Insured as having an "emergency medical condition" and provided a nearly identical, pre-determined sprain/strain or similar soft tissue injury "diagnosis" for every Insured.

59.     For example:

(i)     On April 4, 2015, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision with no airbag deployment in JR's vehicle and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured in the accident. In keeping with the fact that JR was not seriously injured in the accident, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems as a result of the accident, they were of low severity. On June 16, 2015, Marquez purported to conduct an initial examination of JR at East Coast Medical. To the extent that Marquez performed the examination in the first instance, Marquez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Marquez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Marquez provided JR with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JR's presenting problems, nor the treatment plan provided to JR by East Coast Medical, Ferrer, and Marquez, presented any risk of significant complications, morbidity, or mortality. To the contrary, JR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by East Coast Medical, Ferrer, and Marquez consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JR. Even so, East Coast Medical, Ferrer, and Marquez billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Marquez engaged in some legitimate, moderate complexity medical decision-making in connection with the examinations.

(ii)    On May 5, 2015, an Insured named CH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision with no airbag deployment in CH's vehicle and that CH's vehicle was drivable

following the accident. The police report further indicated that CH was not injured in the accident. In keeping with the fact that CH was not seriously injured in the accident, CH did not visit any hospital emergency room following the accident. To the extent that CH experienced any health problems as a result of the accident, they were of low severity. On July 1, 2015, Marquez purported to conduct an initial examination of CH at East Coast Medical. To the extent that Marquez performed the examination in the first instance, Marquez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Marquez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Marquez provided CH with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CH's presenting problems, nor the treatment plan provided to CH by East Coast Medical, Ferrer, and Marquez, presented any risk of significant complications, morbidity, or mortality. To the contrary, CH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by East Coast Medical, Ferrer, and Marquez consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to CH. Even so, East Coast Medical, Ferrer, and Marquez billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Marquez engaged in some legitimate, moderate complexity medical decision-making in connection with the examinations.

(iii)    On March 29, 2016, an Insured named AC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that AC's vehicle was drivable following the accident. The police report further indicated that AC was not injured in the accident. In keeping with the fact that AC was not seriously injured in the accident, AC did not visit any hospital emergency room following the accident. To the extent that AC experienced any health problems as a result of the accident, they were of low severity. On April 1, 2016, Marquez purported to conduct an initial examination of AC at Ray Medical. To the extent that Marquez performed the examination in the first instance, Marquez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Marquez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Marquez provided AC with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AC's presenting problems, nor the treatment plan provided to AC by Ray Medical, Saa, and Marquez, presented any risk of significant complications, morbidity, or mortality. To the contrary, AC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Ray Medical, Saa, and Marquez consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AC. Even so, Ray Medical, Saa, and Marquez billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Marquez engaged in some legitimate, low complexity medical decision-making in connection with the examinations.

(iv)     On May 22, 2017, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that JR was not injured in the accident. In keeping with the fact that JR was not seriously injured in the accident, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems as a result of the accident, they were of low severity. On May 31, 2017, Marquez purported to conduct an initial examination of JR at Ray Medical. To the extent that Marquez performed the examination in the first instance, Marquez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Marquez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Marquez provided JR with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JR's presenting problems, nor the treatment plan provided to JR by Ray Medical, Saa, and Marquez, presented any risk of significant complications, morbidity, or mortality. To the contrary, JR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Ray Medical, Saa, and Marquez consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JR. Even so, Ray Medical, Saa, and Marquez billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Marquez engaged in some legitimate, low complexity medical decision-making in connection with the examinations.

(v)      On August 24, 2017, an Insured named RF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision with no airbag deployment in RF's vehicle and that RF's vehicle was drivable following the accident. The police report further indicated that RF was not injured in the accident. In keeping with the fact that RF was not seriously injured in the accident, RF did not visit any hospital emergency room following the accident. To the extent that RF experienced any health problems as a result of the accident, they were of low severity. On August 25, 2017, Marquez purported to conduct an initial examination of RF at Ray Medical. To the extent that Marquez performed the examination in the first instance, Marquez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Marquez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Marquez provided RF with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither RF's presenting problems, nor the treatment plan provided to RF by Ray Medical, Saa, and Marquez, presented any risk of significant complications, morbidity, or mortality. To the contrary, RF did not need any significant treatment at all as a result of the accident, and the treatment provided by Ray Medical, Saa, and Marquez consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to RF. Even so, Ray Medical, Saa, and Marquez billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Marquez engaged in some legitimate, low complexity medical decision-making in connection with the examinations.

(vi)     On September 20, 2017, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that MG was not injured in the accident. In keeping with the fact that MG was not seriously injured in the accident, MG did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems as a result of the accident, they were of low severity. On September 20, 2017, Marquez purported to conduct an initial examination of MG at Ray Medical. To the extent that Marquez performed the examination in the first instance, Marquez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Marquez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Marquez provided MG with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MG's presenting problems, nor the treatment plan provided to MG by Ray Medical, Saa, Marquez, presented any risk of significant complications, morbidity, or mortality. To the contrary, MG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Ray Medical, Saa, and Marquez consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MG. Even so, Ray Medical, Saa, and Marquez billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Marquez engaged in some legitimate, moderate complexity medical decision-making in connection with the examinations.

(vii)    On December 18, 2017, an Insured named SS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision with no airbag deployment in SS's vehicle and that SS's vehicle was drivable following the accident. The police report further indicated that SS was not injured in the accident. In keeping with the fact that SS was not seriously injured in the accident, SS did not visit any hospital emergency room following the accident. To the extent that SS experienced any health problems at all as the result of the accident, they were of low severity. On January 4, 2018, Marquez purported to conduct an initial examination of SS at East Coast Medical. To the extent that Marquez performed the examination in the first instance, Marquez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Marquez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Marquez provided SS with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither SS's presenting problems, nor the treatment plan provided to SS by East Coast Medical, Ferrer, and Marquez presented any risk of significant complications, morbidity, or mortality. To the contrary, SS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by East Coast Medical, Ferrer, and Marquez consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to SS. Even so, East Coast Medical, Ferrer, and Marquez billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Marquez engaged in some

legitimate, low complexity medical decision-making in connection with the examinations.

(viii)   On February 13, 2019, an Insured named CE was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision with no airbag deployment in CE's vehicle and that CE's vehicle was drivable following the accident. The police report further indicated that CE was not injured in the accident. In keeping with the fact that CE was not seriously injured in the accident, CE did not visit any hospital emergency room following the accident. To the extent that CE experienced any health problems at all as the result of the accident, they were of low severity. On February 25, 2019, Marquez purported to conduct an initial examination of CE at East Coast Medical. To the extent that Marquez performed the examination in the first instance, Marquez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Marquez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Marquez provided CE with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CE's presenting problems, nor the treatment plan provided to CE by East Coast Medical, Ferrer, and Marquez, presented any risk of significant complications, morbidity, or mortality. To the contrary, CE did not need any significant treatment at all as a result of the accident, and the treatment plan provided by East Coast Medical, Ferrer, and Marquez consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to CE. Even so, East Coast Medical, Ferrer, and Marquez billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Marquez engaged in some legitimate, low complexity medical decision-making in connection with the examinations.

(ix)   On April 11, 2019, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision with no airbag deployment in CM's vehicle and that CM's vehicle was drivable following the accident.  The police report further indicated that CM was not injured in the accident. In keeping with the fact that CM was not seriously injured in the accident, CM did not visit any hospital emergency room following the accident. To the extent that CM experienced any health problems at all as the result of the accident, they were of low severity. On April 22, 2019, Marquez purported to conduct an initial examination of CM at East Coast Medical. To the extent that Marquez performed the examination in the first instance, Marquez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Marquez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Marquez provided CM with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CM's presenting problems, nor the treatment plan provided to CM by East Coast Medical, Ferrer, and Marquez, presented any risk of significant complications,

morbidity, or mortality. To the contrary, CM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by East Coast Medical, Ferrer, and Marquez consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to CM. Even so, East Coast Medical, Ferrer, and Marquez billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Marquez engaged in some legitimate, low complexity medical decision-making in connection with the examinations.

(x)     On February 11, 2020, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision with no airbag deployment in JR's vehicle and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured in the accident.  In keeping with the fact that JR was not seriously injured in the accident, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems as a result of the accident, they were of low severity. On February 20, 2020, Grau purported to conduct an initial examination of JR at Ray Medical. To the extent that Grau performed the examination in the first instance, Grau did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Grau did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Grau provided JR with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JR's presenting problems, nor the treatment plan provided to JR by Ray Medical, Saa, Marquez, and Grau, presented any risk of significant complications, morbidity, or mortality. To the contrary, JR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Ray Medical, Saa, Marquez, and Grau consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JR. Even so, Ray Medical, Saa, Marquez, and Grau billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Marquez and Grau engaged in some legitimate, moderate complexity medical decision-making in connection with the examinations.

60.     In keeping with the fact that these putative "diagnoses" were pre-determined and phony, Marquez and Grau – at the direction of the respective Clinic Defendants and respective Clinic Owner Defendants – frequently issued substantially identical, phony "diagnoses", on or about the same date, to two or more insureds who had been involved in a the same underlying accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

61.     For example:

(i)     On April 12, 2014, two Insureds – FM and EM – were purportedly involved in the same automobile accident. Thereafter – incredibly – FM and EM both presented at East Coast Medical for initial examinations on the exact same date, April 22, 2014. FM and EM were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that FM and EM suffered any injuries at all in the accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, East Coast Medical and Marquez – at the direction of Ferrer – provided FM and EM with substantially identical phony sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all of them.

(ii)    On August 26, 2014, two Insureds – MC and EC – were purportedly involved in the same automobile accident. Thereafter – incredibly – MC and EC both presented at Ray Medical for initial examinations on the exact same day, August 27, 2014. MC and EC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MC and EC suffered any injuries at all in the accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Ray Medical and Marquez – at the direction of Saa – provided MC and EC with substantially identical, phony sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all of them.

(iii)   On October 24, 2016, three Insureds – MS, JS, and YA – were purportedly involved in the same automobile accident. Thereafter – incredibly – MS, JS, and YA all presented at Ray Medical for initial examinations on the exact same day, October 28, 2016. MS, JS, and YA were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MS, JS, and YA suffered any injuries at all in the accident, the injuries were different. Even so, at the conclusion of the purported initial evaluations, Ray Medical and Marquez – at the direction of Saa – provided MS, JS, and YA with substantially identical, phony sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all of them.

(iv)    On January 28, 2017, <u>four</u> Insureds – AC, LA, JR, and GM – were purportedly involved in the same automobile accident. Thereafter- incredibly, AC, LA, JR, and GM all presented at East Coast Medical for initial examinations on the exact same date, February 9, 2017. AC, LA, JR, and GM were of varying ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AC, LA, JR, and GM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, East Coast Medical and Marquez – at the direction of Ferrer – provided AC, LA, JR, and GM with substantially identical, phony sprain/strain "diagnoses", and recommended a

substantially identical course of medically unnecessary physical therapy treatment to all of them.

(v)     On February 11, 2018, two Insureds – DN and JN – were purportedly involved in the same automobile accident. Thereafter – incredibly – DN and JN both presented at Ray Medical for initial examinations on the exact same day, February 14, 2018. DN and JN were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DN and JN suffered any injuries at all in the accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Ray Medical, Grau, and Marquez – at the direction of Saa – provided DN and JN with substantially identical, phony sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(vi)    On April 7, 2018, two Insureds – GG and LF – were purportedly involved in the same automobile accident. Thereafter – incredibly – GG and LF both presented at East Coast Medical for initial examinations on the exact same day, April 12, 2018. GG and LF were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that GG and LF suffered any injures at all in their accident, the injures were different. Even so, at the conclusion of the purported initial examinations, East Coast Medical and Marquez – at the direction of Ferrer – provided GG and LF with substantially identical, phony sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all of them.

(vii)   On June 30, 2018, two Insureds – JM and VP – were purportedly involved in the same automobile accident. Thereafter – incredibly – JM and VP both presented at Ray Medical for initial examinations on the exact same date, July 13, 2018. JM and VP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JM and VP suffered any injuries at all in the accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Ray Medical, Grau, and Marquez – at the direction of Saa – provided JM and VP with substantially identical, phony sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(viii)  On April 6, 2019, two Insureds – LO and MS – were purportedly involved in the same automobile accident. Thereafter – incredibly – LO and MS both presented at East Coast Medical for initial examinations on the exact same date, April 12, 2019. LO and MS were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LO and MS suffered any injuries at all in the accident, the

injuries were different. Even so, at the conclusion of the purported initial examinations, East Coast Medical and Marquez – at the direction of Ferrer – provided LO and MS with substantially identical phony sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all of them.

(ix)   On October 21, 2019, two Insureds – MM and GM – were purportedly involved in the same automobile accident. Thereafter – incredibly – MM and GM both presented at East Coast Medical for initial examinations on the exact same day, October 31, 2019. MM and GM were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MM and GM suffered any injures at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, East Coast Medical and Marquez – at the direction of Ferrer – provided MM and GM with substantially identical, phony sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all of them.

(x)   On January 28, 2020, two Insureds – RT and EL– were purportedly involved in the same automobile accident. Thereafter – incredibly – RT and EL both presented at Ray Medical for initial examinations on the exact same date, January 30, 2020. RT and EL were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RT and EL suffered any injuries at all in the accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Ray Medical, Grau, and Marquez – at the direction of Saa – provided RT and EL with substantially identical, phony sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

62.   Based on these phony and pre-determined soft tissue injury "diagnoses", the vast majority of the Insureds in the claims identified in Exhibits "1" and "2" were directed to return to one of the Clinic Defendants for medically unnecessary "physical therapy", which was performed – to the extent that it was performed at all – by completely unsupervised massage therapists including: (i) Montana at East Coast Medical and (ii) Fleites, Senespleda, and Arbolaez at Ray Medical.

63.   The false "diagnoses" contained within the initial examination reports were included to give the false impression that the initial examinations entailed some legitimate medical decision-making, to create a false basis for the charges under CPT codes 99204 and 99203, and to create a

false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

64.     In the claims for initial examinations identified in Exhibits "1" and "2", the respective Clinic Defendants, respective Clinic Owner Defendants, Marquez, and Grau routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   East Coast Medical and Ray Medical never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they unlawfully were operated without legitimate medical directors.

65.     In this context, Marquez – who at all relevant times purported to serve as the "medical director" East Coast Medical and Ray Medical – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1). Had Marquez done so, he would have observed and put a stop to these fraudulent charges for initial examinations.

## 2.     The Fraudulent Charges for Follow-Up Examinations

66.     In addition to the fraudulent initial examinations, most of the Insureds in the claims identified in Exhibits "1" and "2" purportedly received multiple, fraudulent follow-up examinations at East Coast Medical and Ray Medical, with Marquez purporting to personally perform or directly supervise a substantial majority of the follow-up examinations in the claims identified in Exhibits "1" and "2".

a.      **The Upcoded Charges for Follow-up Examinations at East Coast Medical**

67.     East Coast Medical's purported follow-up examinations were billed to GEICO typically under CPT codes 99213 and 99215.

68.     Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination represents – among other things – that: (i) the patient presented with problems of low to moderate severity; and (ii) the physician performed at least two of the following three components during the examination: (a) took an "expanded problem focused" patient history; (b) conducted an "expanded problem focused physical examination"; and (c) engaged in medical decision-making of "low complexity".

69.     Pursuant to the CPT Assistant, the use of CPT code 99215 to bill for a follow-up examination represents – among other things – that: (i) the patient presented with problems of moderate to high severity; and (ii) the physician performed at least two of the following three components during the examination: (a) took a "comprehensive" patient history; (b) conducted a "comprehensive" physical examination; and (c) engaged in medical decision-making of "high complexity".

70.     As set forth below, the charges for the follow-up examinations identified in Exhibit "1" misrepresented the nature, extent, and results of the follow-up examinations.

(i)     **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

71.     To the extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their automobile accidents, the injuries almost always were minor soft tissue injuries such as sprains and strains, which were of low or minimal severity, even at their onset.

72.     Minor soft tissue injuries such as strains and sprains virtually always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims

identified in Exhibit "1" presented for their putative follow-up examinations – typically weeks or months after their typically minor accidents – the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or else their presenting problems were minimal.

73.    Even so, in the claims for the follow-up examinations identified in Exhibit "1", East Coast Medical, Ferrer, and Marquez made the following misrepresentations:

(i)     When billing GEICO for putative follow-up examinations using CPT code 99213 in the claims identified in Exhibit "1", East Coast Medical, Ferrer, and Marquez falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all; and

(ii)    When billing GEICO for putative follow-up examinations using CPT code 99215 in the claims identified in Exhibit "1", East Coast Medical, Ferrer, and Marquez falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

74.    For example:

(i)     On February 6, 2015, an Insured named JB was involved in an automobile accident. The contemporaneous police report indicated that the accident as a low-impact, rear-end collision with no airbag deployment in JB's vehicle, and that JB's vehicle was drivable following the accident. The police report further indicated that JB was not injured in the accident. In keeping with the fact that JB was not seriously injured in the accident, JB did not visit any hospital emergency room following the accident. To the extent that JB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of JB by Marquez on May 5, 2015, East Coast Medical, Ferrer, and Marquez billed GEICO for the follow-up examination using CPT code 99215 and thereby falsely represented that JB presented with problems of moderate to high severity. In keeping with the fact that JB had no presented problems of moderate to high severity, East Coast Medical, Ferrer, and Marquez actually stopped treating JB on May 5, 2015.

(ii)    On July 6, 2016, an Insured named MD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-

end collision with no airbag deployment in MD's vehicle and that MD's vehicle was drivable following the accident. The police report further indicated that MD was not injured in the accident. In keeping with the fact that MD was not seriously injured in the accident, MD did not visit any hospital emergency room following the accident. To the extent that MD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of MD by Marquez on September 19, 2016, East Coast Medical, Ferrer, and Marquez billed GEICO for the follow-up examination using CPT code 99215 and thereby falsely represented that MD presented with problems of moderate to high severity. In keeping with the fact that MD had no presenting problems of moderate to high severity, East Coast Medical, Ferrer, and Marquez actually stopped treating MD on September 19, 2016.

(iii)    On March 5, 2017, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision with no airbag deployment in MP's vehicle and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured in the accident. In keeping with the fact that MP was not seriously injured in the accident, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of MP by Marquez on April 27, 2017, East Coast Medical, Ferrer, and Marquez billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that MP presented with problems of low to moderate severity.

(iv)    On December 18, 2017, an Insured named SS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, front-end collision with no airbag deployment in SS's vehicle and that SS's vehicle was drivable following the accident. The police report further indicated that SS was not injured in the accident. In keeping with the fact that SS was not seriously injured in the accident, SS did not visit any hospital emergency room following the accident. To the extent that SS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of SS by Marquez on January 29, 2018, East Coast Medical, Ferrer, and Marquez billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that SS presented with problems of low to moderate severity. Even further, following an additional purported follow-up examination of SS by Marquez on March 12, 2018, East Coast Medical, Ferrer, and Marquez billed GEICO for the follow-up examination using CPT code 99215 and thereby falsely represented that SS presented with problems of moderate to high severity. In keeping with the fact that SS had no presenting problems of moderate to

40

high severity, East Coast Medical, Ferrer, and Marquez actually stopped treating SH on March 12, 2018.

(v)     On April 11, 2019, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, side-swipe collision with no airbag deployment in CM's vehicle, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured in the accident. In keeping with the fact that CM was not seriously injured in the accident, CM did not visit any hospital emergency room following the accident. To the extent that CM experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following purported follow-up examinations, of CM by Marquez on June 4, 2019 and June 18, 2019, East Coast Medical, Ferrer, and Marquez billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that CM presented with problems of low to moderate severity. Even further, following an additional purported follow-up examination of CM by Marquez on July 24, 2019, East Coast Medical, Ferrer, and Marquez billed GEICO for the follow-up examination using CPT code 99215 and thereby falsely represented that CM presented with problems of moderate to high severity. In keeping with the fact that CM had no presenting problems of moderate to high severity, East Coast Medical, Ferrer, and Marquez actually stopped treating CM on July 24, 2019.

75.     These are only representative examples. In virtually all of the claims for follow-up examinations identified in Exhibit "1", East Coast Medical, Ferrer, and Marquez falsely represented that the Insureds presented with problems of low to moderate severity or moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

76.     In the claims for follow-up examinations identified in Exhibit "1", East Coast Medical, Ferrer, and Marquez routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99213 or 99215, because examinations billable under CPT codes 99213 and 99215 are reimbursable at higher rates than examinations

involving presenting problems of minimal severity, or no severity; and (ii) create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

      (ii)      **Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

77.      What is more, in the claims for follow-up examinations identified in Exhibit "1", neither Marquez nor any other physician associated with East Coast Medical ever took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

78.      Rather, following the purported follow-up examinations, Marquez – at the direction of East Coast Medical and Ferrer – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

79.      The phony "follow-up examinations" that East Coast Medical, Ferrer, and Marquez purported to provide to the Insureds in the claims identified in Exhibit "1" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were prearranged to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into East Coast Medical's office.

b.     **The Charges for Illusory Follow-up Examinations at Ray Medical**

80.     Ray Medical, Saa, and Marquez routinely billed GEICO for multiple putative follow-up examinations under CPT code 99211 contemporaneous with their supposed provision of physical therapy treatment.

81.     However, these supposed "examinations" were never truly separate services from the putative physical therapy services.

82.     Instead, Ray Medical, Saa, and Marquez billed GEICO for the illusory follow-up examinations under CPT codes 99211 in order to maximize the fraudulent billing they could submit to GEICO.

83.     In keeping with the fact that the follow-up examinations purportedly provided contemporaneous with the physical therapy services were illusory, Ray Medical, Saa, and Marquez never submitted any reports, notes, or any substantiating documentation whatsoever in connection with the phony follow-up examinations billed under CPT code 99211.

84.     Even so, Ray Medical, Saa, and Marquez routinely submitted duplicative charges under CPT code 99211 for illusory follow-up examinations contemporaneous with charges for putative physical therapy services.

85.     For example:

(i)     Ray Medical, Saa, Marquez, and Fleites billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named AS contemporaneous with physical therapy services purportedly provided on numerous separate dates, including March 30, 2015, March 31, 2015, April 1, 2015, April 2, 2015, April 6, 2015, April 7, 2015, April 8, 2015, April 9, 2015, April 13, 2015, April 14, 2015, April 15, 2015, April 17, 2015, April 21, 2015, April 22, 2015, April 23, 2015, April 27, 2015, April 28, 2015, April 30, 2015, May 5, 2015, May 6, 2015, May 7, 2015, May 11, 2015, May 13, 2015, May 14, 2015, May 15, 2015, May 18, 2015, May 20, 2015, May 21, 2015, May 26, 2015, May 28, 2015, May 29, 2015, June 2, 2015, June 3, 2015, June 8, 2015, June 11, 2015, June 15, 2015, June 16, 2015, and June 22, 2015. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Ray Medical, Saa,

Marquez, and Fleites provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes together with the billing for the follow-up examinations.

(ii)   Ray Medical, Saa, Marquez, Fleites, and Senespleda billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named DG contemporaneous with physical therapy services purportedly provided on numerous <u>separate dates</u>, including October 21, 2016, October 25, 2016, October 26, 2016, November 7, 2016, November 30, 2016, December 1, 2016, December 23, 2016, December 26, 2016, December 27, 2016, December 29, 2016, December 30, 2016, January 2, 2017, January 3, 2017, January 5, 2017, January 9, 2017, January 10, 2017, January 12, 2017, January 13, 2017, January 16, 2017, January 17, 2017, January 18, 2017, January 24, 2017, January 25, 2017, January 26, 2017, January 30, 2017, January 31, 2017, February 2, 2017, and February 3, 2017. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Ray Medical, Saa, Marquez, Fleites, and Senespleda provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes together with the billing for the follow-up examinations.

(iii)  Ray Medical, Saa, Marquez, and Fleites billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named ES contemporaneous with physical therapy services purportedly provided on numerous <u>separate dates</u>, including May 10, 2018, May 11, 2018, May 15, 2018, May 16, 2018, May 17, 2018, May 22, 2018, May 24, 2018, May 29, 2018, June 1, 2018, June 7, 2018, June 12, 2018, June 15, 2018, June 19, 2018, June 20, 2018, July 3, 2018, July 10, 2018, July 11, 2018, July 12, 2018, July 13, 2018, July 16, 2018, July 17, 2018, July 18, 2018, July 19, 2018, July 20, 2018, July 24, 2018, July 25, 2018, July 26, 2018, July 30, 2018, July 31, 2018, August 1, 2018, August 2, 2018,  August 6, 2018, August 7, 2018, August 8, 2018, August 9, 2018, August 10, 2018, August 13, 2018, and August 14, 2018. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Ray Medical, Saa, Marquez, and Fleites provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes together with the billing for the follow-up examinations.

(iv)   Ray Medical, Saa, Marquez, Fleites, and Senespleda billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named ND contemporaneous with physical therapy services purportedly provided on numerous <u>separate dates</u>, including January 3, 2019, January 4, 2019, January 7, 2019, January 8, 2019, January 9, 2019, January 10, 2019, January 21, 2019, January 23, 2019, January 24, 2019, January 25, 2019, January 28, 2019, January 30, 2019, February 1, 2019, February 6, 2019, February 7, 2019, February 12, 2019, February 13, 2019, February 25, 2019, March 20, 2019, March 21, 2019, March 22, 2019, March 25, 2019, March 26, 2019, March 29, 2019, April 2, 2019, April 3, 2019, April 4, 109, April 9, 2019, April 10, 2019, April 11, 2019, April 16,

2019, April 17, 2019, and April 18, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Ray Medical, Saa, Marquez, Fleites, and Senespleda provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes together with the billing for the follow-up examinations.

(v)     Ray Medical, Saa, Marquez, Fleites, and Senespleda billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named YA contemporaneous with physical therapy services purportedly provided on numerous <u>separate dates</u>, including January 7, 2020, January 8, 2020, January 9, 2020, January 13, 2020, January 14, 2020, January 15, 2020, January 16, 2020, January 21, 2020, January 23, 2020, January 27, 2020, January 28, 2020, January 29, 2020, January 30, 2020, February 4, 2020, February 10, 2020, February 12, 2020, February 17, 2020, February 18, 2020, February 20, 2020, February 24, 2020, February 25, 2020, February 26, 2020, February 28, 2020, March 3, 2020, March 5, 2020, March 11, 2020, March 12, 2020, March 16, 2020, March 17, 2020, March 18, 2020, March 19, 2020, April 20, 2020, April 21, 2020, April 22, 2020, April 24, 2020, April 25, 2020, April 26, 2020, April 27, 2020, April 28, 2020, April 30, 2020, May 5, 2020, May 11, 2020, and May 12, 2020. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Ray Medical, Saa, Marquez, Fleites, and Senespleda provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes together with the billing for the follow-up examinations.

86.     These are only representative examples. In the claims for follow-up examinations identified in Exhibits "1" and "2", the Clinic Defendants, Clinic Owner Defendants, and Marquez routinely fraudulently misrepresented that the follow-up examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   East Coast Medical and Ray Medical never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they were operated in violation of the Clinic Act.

45

3.      **The Fraudulent Claims for "Physical Therapy"**

87.     In keeping with the fact that the purported "results" of the follow-up examinations were pre-determined, and had no legitimate connection to the Insureds' true medical circumstances or presentation:

(i)     The East Coast Medical Defendants caused the substantial majority of Insureds in the claims identified in Exhibit "1" to receive substantially identical "physical therapy" treatments for a substantially similar amount of time, regardless of the purported "outcome" of the examinations and previous physical therapy treatments, including: (a) therapeutic exercises; (b) electrical stimulation therapy; (c) ultrasound therapy; (d) therapeutic procedures; (e) neuromuscular reeducation; (f) manual therapy techniques; (g) therapeutic activities; (h) paraffin baths; and (i) mechanical traction.

(ii)    The Ray Medical Defendants caused the substantial majority of Insureds in the claims identified in Exhibit "2" to receive substantially identical "physical therapy" treatments for a substantially similar amount of time, regardless of the purported "outcome" of the examinations and previous physical therapy treatments, including: (a) therapeutic exercises; (b) electrical stimulation therapy; (c) ultrasound therapy; (d) therapeutic procedures; (e) neuromuscular reeducation; (f) manual therapy; and (g) mechanical traction.

88.     In a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

89.     In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's individual treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

90.     By contrast, at each of the Clinic Defendants, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the

Defendants' fraudulent treatment and billing protocols. The purported "physical therapy" provided through each of the Clinic Defendants to GEICO Insureds therefore was medically useless.

91.     Furthermore, in the claims for physical therapy services identified in Exhibits "1" – and "2",  the charges were fraudulent, unlawful, and non-reimbursable because the billing falsely represented that Marquez had performed or directly supervised the services, when in fact the "physical therapy" services were performed – to the extent that they were performed at all – by completely unsupervised massage therapists associated with each of the Clinic Defendants, including: (i) Montana at East Coast Medical; and (ii) Fleites, Senespleda, and Arbolaez at Ray Medical.

### 4.     The Fraudulently Unbundled Charges for Range of Motion Testing at East Coast Medical

92.     The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion". Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

93.     A range of motion test consists of a measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint.  In a range of motion test, the physician asks the patient to move his or her joints at various angles, or the physician moves the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

94.     Physical examinations performed on patients with soft-tissue trauma necessarily require range of motion tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion is an essential component of the "hands-on" examination of a trauma patient.

95.    Since range of motion tests must be conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, range of tests are to be reimbursed as an element of the initial examinations and follow-up examinations. In other words, health care providers cannot conduct and bill for an initial examination or follow-up examination, then bill separately for contemporaneously-provided range of motion tests.

96.    Even so East Coast Medical, Ferrer, and Marquez routinely charged separately for range of motion tests using CPT code 95851, despite the fact that the tests were part and parcel of the charges that they routinely submitted for the initial examinations under CPT codes 99203 and 99204, and for the follow-up examinations under CPT codes 99213 and 99215, despite knowing that the Insureds already purportedly had undergone manual range of motion testing during their examinations, and despite the fact that East Coast Medical, Ferrer, and Marquez knew that the reimbursement for range of motion testing already had been paid by GEICO as a component of the reimbursement for the examinations.

**5.    East Coast Medical's Fraudulent Misrepresentations Regarding the Existence of Written, Interpretive Reports for the Range of Motion Tests**

97.    Not only were East Coast Medical, Ferrer, and Marquez's charges for the range of motion tests fraudulent because the billing for the tests was fraudulently unbundled from the charges for contemporaneous examinations, but the charges also were fraudulent because they falsely represented that East Coast Medical, Ferrer, and Marquez prepared written reports interpreting the test data.

98.    Pursuant to the CPT Assistant, when a health care provider submits a charge for range of motion testing using CPT code 95851, the provider represents that it has prepared a written report interpreting the data obtained from the tests.

99.     For example, the CPT Assistant states that "Interpretation of the results with preparation of a separate, distinctly, identifiable, signed written report is required when reporting codes 95851".

100.    Though East Coast Medical, Ferrer, and Marquez often submitted billing for range of motion tests using CPT code 95851, East Coast Medical, Ferrer, and Marquez did not prepare any written reports interpreting the data obtained from the tests.

101.    East Coast Medical, Ferrer, and Marquez did not prepare written reports interpreting the data obtained from the tests because the tests were not meant to impact any Insured's course of treatment. Rather, to the extent they were performed at all, the tests were performed as part of the East Coast Medical Defendants' predetermined fraudulent billing and treatment protocol and were designed solely to financially enrich the Defendants at the expense of GEICO and other insurers.

III.    **The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO**

102.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA-1500 forms and treatment reports through the Clinic Defendants to GEICO, containing thousands of individual charges, seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

103.    The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

(i)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Clinic Defendants were in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance. In fact, the Clinic Defendants never were in compliance with the Clinic Act, and never were eligible to collect PIP Benefits because the Clinic Defendants operated without legitimate medical directors who legitimately fulfilled the statutory requirements applicable to clinic medical directors.

(ii)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement, because: (a) they were medically unnecessary and provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and (b) in the case of the physical therapy services, because they were provided by massage therapists in contravention of Florida law.

(iii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)    The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants frequently misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided, in order to increase the amount of reimbursement the Defendants could unlawfully obtain.

## IV.    **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

104.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO. Even so, the Defendants knowingly misrepresented and concealed facts related to the Clinic Defendants in an effort to prevent discovery of the fact that: (i) the Clinic Defendants lacked legitimate medical directors, and therefore were ineligible to collect PIP Benefits in the first instance; (ii) the Fraudulent Services were provided – to the extent that they were provided at all – by unsupervised massage therapists, and therefore were not eligible for PIP reimbursement; and (iii) that the Fraudulent Services were medically unnecessary.

105.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $4,600,000.00.

106.     GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it commenced this action.

### FIRST CAUSE OF ACTION
**Against East Coast Medical and Ray Medical**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

107.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-106 above.

108.     There is an actual case in controversy between GEICO and the Clinic Defendants regarding more than $100,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

109.     The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because they unlawfully were operated in violation of the Clinic Act's medical director and operating requirements.

110.     The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

111.     The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were performed without

supervision by individuals who were not licensed to perform the pertinent services, or else constituted non-reimbursable massage therapy services.

112.     The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

113.     The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

114.     The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

115.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that East Coast Medical and Ray Medical have no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Ferrer and Marquez
### (Violation of RICO, 18 U.S.C. § 1962(c))

116.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-106 above.

117.     East Coast Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

118.     Ferrer and Marquez knowingly have conducted and/or participated, directly or indirectly, in the conduct of East Coast Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that East Coast Medical was not eligible to receive under the No-Fault Law because: (i) East Coast Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the East Coast Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

119.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

120.     East Coast Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Ferrer and Marquez operated East Coast Medical, inasmuch as East Coast Medical was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for East Coast Medical to function. Furthermore, the intricate planning

required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the East Coast Medical Defendants continue to submit and attempt to collect on the fraudulent billing submitted through East Coast Medical to the present day.

121.   East Coast Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt to collect on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by East Coast Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

122.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,600,000.00 pursuant to the fraudulent bills submitted through the East Coast Medical.

123.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Ferrer, Marquez, and Montana**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

124.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-106 above.

125.   East Coast Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

126.   Ferrer, Marquez, and Montana are employed by or associated with the East Coast Medical enterprise.

127.    Ferrer, Marquez, and Montana knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of East Coast Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that East Coast Medical was not eligible to receive under the No-Fault Law because: (i) East Coast Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the East Coast Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

128.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

129.    Ferrer, Marquez, and Montana knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

130.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,600,000.00 pursuant to the fraudulent bills submitted through the East Coast Medical enterprise.

131.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against the East Coast Medical Defendants**
**(Under Fla. Stat. § 501.201 et. seq.)**

132.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-106 above.

133.    The East Coast Medical Defendants are actively engaged in trade and commerce in the State of Florida.

134.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

135.    The East Coast Medical Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

136.    The bills and supporting documents submitted or caused to be submitted by the East Coast Medical Defendants to GEICO were fraudulent in that they misrepresented: (i) East Coast Medical's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

137.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of the East Coast Medical Defendants has been materially injurious to GEICO and its Insureds.

138.    The conduct of the East Coast Medical Defendants was the actual and proximate cause of the damages sustained by GEICO.

139.    The East Coast Medical Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $3,600,000.00.

140.    By reason of the East Coast Medical Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**FIFTH CAUSE OF ACTION**
**Against Ferrer, Marquez, and Montana**
**(Under Fla. Stat. § 772.103 et seq.)**

141.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-106 above.

142.    In furtherance of the fraudulent scheme, Ferrer, Marquez, and Montana submitted or caused to be submitted thousands of fraudulent charges through the East Coast Medical enterprise to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

143.    When the billing was submitted, Ferrer, Marquez, and Montana knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) East Coast Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement

in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the East Coast Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

144.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

145.    This pattern of criminal activity resulted in Ferrer, Marquez, and Montana receiving more than $3,600,000.00 in PIP Benefits to which they were not entitled.

146.    Ferrer, Marquez, and Montana's patten of criminal activity has caused GEICO to sustain damages of at least $3,600,000.00

147.    By reason of Ferrer, Marquez, and Montana's conduct, GEICO is also entitled to recover threefold the damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

## SIXTH CAUSE OF ACTION
## Against the East Coast Medical Defendants
### (Common Law Fraud)

148.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-106 above.

149.    The East Coast Medical Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the

course of submitting, or causing to be submitted, thousands of fraudulent charges through East Coast Medical for the Fraudulent Services.

150. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that East Coast Medical was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact East Coast Medical never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and billed to GEICO and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided or billed to GEICO, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

151. The East Coast Medical Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through East Coast Medical that were not reimbursable.

152. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,600,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the East Coast Medical Defendants through East Coast Medical.

153.    The East Coast Medical Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

154.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against the East Coast Medical Defendants**
**(Unjust Enrichment)**

155.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-106 above.

156.    As set forth above, the East Coast Medical Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

157.    When GEICO paid the bills and charges submitted or caused to be submitted by the East Coast Medical Defendants through East Coast Medical, it reasonably believed that it was legally obligated to make such payments based on the East Coast Medical Defendants' improper, unlawful, and/or unjust acts.

158.    The East Coast Medical Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the East Coast Medical Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

159.    The East Coast Medical Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

160.    By reason of the above, the East Coast Medical Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $3,600,000.00.

## EIGHTH CAUSE OF ACTION
### Against Saa and Marquez
### (Violation of RICO, 18 U.S.C. § 1962(c))

161.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-106 above.

162.    Ray Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

163.    Saa and Marquez knowingly have conducted and/or participated, directly or indirectly, in the conduct of Ray Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Ray Medical was not eligible to receive under the No-Fault Law because: (i) Ray Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Ray Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

164.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

165.    Ray Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Saa and Marquez operated Ray Medical, inasmuch as Ray Medical was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for Ray Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Ray Medical Defendants continue to submit and attempt to collect on the fraudulent billing submitted through Ray Medical to the present day.

166.    Ray Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt to collect on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Ray Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

167.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted through the Ray Medical enterprise.

168.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**NINTH CAUSE OF ACTION**
**Against Saa, Marquez, Fleites, and Arbolaez**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

169.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-106 above.

170.   Ray Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

171.   Saa, Marquez, Fleites, and Arbolaez are employed by or associated with the Ray Medical enterprise.

172.   Saa, Marquez, Fleites, and Arbolaez knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Ray Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Ray Medical was not eligible to receive under the No-Fault Law because: (i) Ray Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Ray Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

173.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

174.    Saa, Marquez, Fleites, and Arbolaez knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

175.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted through the Ray Medical enterprise.

176.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TENTH CAUSE OF ACTION**
**Against the Ray Medical Defendants**
**(Under Fla. Stat. § 501.201 et. seq.)**

177.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-106 above.

178.    The Ray Medical Defendants are actively engaged in trade and commerce in the State of Florida.

179.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

180.    The Ray Medical Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

181.     The bills and supporting documents submitted or caused to be submitted by the Ray Medical Defendants to GEICO were fraudulent in that they misrepresented: (i) Ray Medical's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

182.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of the Ray Medical Defendants has been materially injurious to GEICO and its Insureds.

183.     The conduct of the Ray Medical Defendants was the actual and proximate cause of the damages sustained by GEICO.

184.     The Ray Medical Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $1,000,000.00.

185.     By reason of the Ray Medical Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

### ELEVENTH CAUSE OF ACTION
**Against Saa, Marquez, Fleites, and Arbolaez**
**(Under Fla. Stat. § 772.103 et seq.)**

186.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-106 above.

187.     In furtherance of the fraudulent scheme, Saa, Marquez, Fleites, and Arbolaez submitted or caused to be submitted thousands of fraudulent charges through the Ray Medical enterprise to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

188.     When the billing was submitted, Saa, Marquez, Fleites, and Arbolaez knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Ray Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Ray Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

189.     These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

190.     This pattern of criminal activity resulted in Saa, Marquez, Fleites, and Arbolaez receiving more than $1,000,000.00 in PIP Benefits to which they were not entitled.

191.     Saa, Marquez, Fleites, and Arbolaez's patten of criminal activity has caused GEICO to sustain damages of at least $1,000,000.00.

192.     By reason of Saa, Marquez, Fleites, and Arbolaez's conduct, GEICO is also entitled to recover threefold the damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

## TWELFTH CAUSE OF ACTION
### Against the Ray Medical Defendants
### (Common Law Fraud)

193.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-106 above.

194.    The Ray Medical Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, hundreds of fraudulent charges through Ray Medical for the Fraudulent Services.

195.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Ray Medical was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Ray Medical never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and billed to GEICO and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided or billed to GEICO, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.The Ray Medical Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Ray Medical that were not reimbursable.

196.    The Ray Medical Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Ray Medical that were not reimbursable.

197.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Ray Medical Defendants through Ray Medical.

198.    The Ray Medical Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

199.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION
### Against the Ray Medical Defendants
### (Unjust Enrichment)

200.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-106 above.

201.    As set forth above, the Ray Medical Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

202.    When GEICO paid the bills and charges submitted or caused to be submitted by the Ray Medical Defendants Ray Medical, it reasonably believed that it was legally obligated to make such payments based on Ray Medical Defendants' improper, unlawful, and/or unjust acts.

203.     The Ray Medical Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Ray Medical Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

204.     Ray Medical Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

205.     By reason of the above, the Ray Medical Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,000,000.00.

206.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## JURY DEMAND

207.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against East Coast Medical and Ray Medical, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that East Coast Medical and Ray Medical have no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Ferrer and Marquez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $3,600,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Ferrer, Marquez, and Montana, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $3,600,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against East Coast Medical, Ferrer, Marquez, and Montana, compensatory damages in an amount to be determined at trial but in excess of $3,600,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2);

E.      On the Fifth Cause of Action against Ferrer, Marquez, and Montana, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $3,600,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to Fla. Stat. § 772.104.

F.      On the Sixth Cause of Action against East Coast Medical, Ferrer, Marquez, and Montana, compensatory damages in an amount to be determined at trial but in excess of $3,600,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against East Coast Medical, Ferrer, Marquez, and Montana, more than $3,600,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Saa and Marquez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,000,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Saa, Marquez, Fleites, and Arbolaez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.      On the Tenth Cause of Action against Ray Medical, Saa, Marquez, Fleites, and Arbolaez, compensatory damages in an amount to be determined at trial but in excess of $1,000,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2);

K.      On the Eleventh Cause of Action against Saa, Marquez, Fleites, and Arbolaez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to Fla. Stat. § 772.104.

L.      On the Twelfth Cause of Action against Ray Medical, Saa, Marquez, Fleites, and Arbolaez, compensatory damages in an amount to be determined at trial but in excess of $1,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

M.      On the Thirteenth Cause of Action against Ray Medical, Saa, Marquez, Fleites, and Arbolaez, more than $1,000,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: March 1, 2022

/s/ John P. Marino
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen L. Wenger (FBN 92136)
SMITH, GAMBRELL & RUSSELL, LLP
50 North Laura Street, Suite 2600

Jacksonville, Florida 32202
Phone: (904) 598-6100
Facsimile: (904) 598-6204
ltrowell@sgrlaw.com
jmarino@sgrlaw.com
kwenger@sgrlaw.com

*Attorneys for Plaintiffs*